Filed 10/6/22  In re Justin F. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Justin F., a Person Coming Under the Juvenile Court Law. | B312640 (Los Angeles County Super. Ct. No. 18CCJP03154) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> XIOMARA L., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Xiomara L.

Dawyn Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

Xiomara L. (Mother) appeals from the juvenile court's orders denying two successive petitions for modification under Welfare and Institutions Code[1] section 388 and the court's order terminating her parental rights over five-year-old Justin F. under section 366.26. Mother contends the court abused its discretion in denying her section 388 petitions without a hearing despite evidence Mother completed a six-month outpatient substance abuse program and had 24 consecutive negative drug tests. Mother also argues the trial court erred in finding in a conclusory fashion that the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i), did not apply. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Referral, Dependency Petition, and Detention*
On April 26, 2018 the Los Angeles County Department of Children and Family Services (Department) received a referral alleging general neglect of Justin, then 21 months old, and his nine-year-old half-brother Henry E. by Mother and Justin's

---

[1]    Further statutory references are to the Welfare and Institutions Code.

2

father, Justin F., Sr. (Father).[2] The referral alleged the parents, who lived together, used marijuana daily and were suspected of using methamphetamine. In recent months the parents lost an excessive amount of weight, were pale, unkempt, incoherent, and violently aggressive towards each other, and they were often seen in the street at night having hallucinations. The caller reported Mother and Father engaged in violent physical altercations on a nearly daily basis. Mother was often bruised, and the parents were heard throwing objects, punching walls, and breaking doors. The children were crying during the fights, and Justin appeared sad and withdrawn. The parents often left the children without supervision in the middle of the night.

In her April 26 interview with a social worker, Mother disclosed she smoked marijuana about three times a week when the children were not present, but she denied using methamphetamine or other drugs. Mother stated she was stressed by her father's recent death and news that Henry's abusive father, Henry E., Sr. (Henry Sr.), would soon be released from prison. Mother admitted that she and Father had been getting into more frequent arguments, but she denied any physical abuse and stated the scratches on her face were self-inflicted due to her anxiety and anger issues. Henry told the social worker Mother and Father argued and yelled, and Mother

---

[2] Father is not a party to this appeal. Further, although one of the section 388 petitions at issue on appeal concerns both Justin and Henry, Mother in her opening brief states she is not challenging any orders relating to Henry. We therefore focus on Justin.

called Father bad names, but Henry had not seen them hit each other.[3]

On April 27, 2018 Mother tested positive for cannabinoids, methamphetamine, and amphetamine. However, Mother continued to deny she used methamphetamine. On May 12 the Department detained the children and placed them with maternal aunt Wendy P.

On May 16, 2018 the Department filed a dependency petition alleging Mother and Father were current abusers of methamphetamine, amphetamine, and marijuana; Mother had mental and emotional problems, including depression, anxiety, and anger management issues; and Henry Sr. had a history of violent conduct and suffered criminal convictions for spousal battery and second degree robbery that placed the children at serious risk of harm.

B.    *The Jurisdiction and Disposition Hearing and Initial Reunification Period*

At the October 1, 2018 jurisdiction and disposition hearing, the juvenile court sustained the allegations in the petition under section 300, subdivision (b)(1), as to Mother's and Father's substance abuse, Mother's mental health, and Henry Sr.'s criminal history. The court declared Justin and Henry

---

[3]    Mother was arrested in 2012 for domestic violence involving Henry Sr., in 2014 for assault with a deadly weapon after she struck maternal grandmother's boyfriend with a bat, and in 2017 for assault with a deadly weapon involving her cousin's partner.

dependents of the court, removed them from the parents' custody, and ordered them to remain placed in Wendy's home. The court ordered Mother to complete a six-month drug and alcohol program with aftercare, a 12-step program with sponsor, weekly random drug testing, parenting classes, and individual counseling with a licensed therapist to address case issues, including domestic violence.[4] The court ordered monitored visits for at least two hours twice per week, with the Department having discretion to liberalize visitation.

As of November 5, 2018 Mother was testing negative for drugs. She completed an outpatient substance abuse program on September 26, 2018 (prior to the jurisdiction and disposition hearing). Mother enrolled in individual counseling, and she was attending monthly psychiatric appointments and taking prescribed medication. She also completed 24 hours of parenting classes. Mother consistently visited Justin and Henry, and the monitors did not report any concerns. The Department subsequently liberalized visitation for Mother to unmonitored day visits, and later overnight visits in Mother's home.

In March 2019 the Department reported the children had slowly adjusted to Wendy's home and parenting style, and they were "thriving." Mother maintained her sobriety, and her physical appearance and emotional well-being had improved dramatically. The social worker observed Mother was "transparent, cooperative, and had made positive stri[d]es

---

[4] On August 15, 2018 Mother completed a 10-session domestic violence support group. The court's October 1, 2018 order did not require Mother to complete a domestic violence program.

forward in order to regain custody of her children." Father was living with his parents. At the April 2, 2019 review hearing, the juvenile court released the children to Mother, conditioned on her continuing to test negative for drugs.

C. *Subsequent Events and Petitions*

In September 2019 the Department reported Mother missed four drug tests in June and July. Mother told the social worker she remained sober but had difficulty making it to the tests. Mother reported she was not in a relationship with Father and had not seen him since Justin's birthday party in July 2019. Father was living with the paternal grandparents. Mother and the children lived in a room rented from paternal aunt Emma F., who reported Mother appeared to be sober and the children were doing well in Mother's care.

However, on September 10, 2019 the Department learned Father had been arrested on August 16, 2019 after an altercation with Mother at Emma's home. Mother explained she called the police on August 16 after Father came to Emma's home to reconcile with Mother, and when she declined, he became aggressive. Mother told the responding police officers that Father pushed her, causing her to fall on her back into a closet, and he threw a picture frame at her head and then a pedestal fan at her body. Mother obtained a three-year no-contact criminal protective order against Father. Mother told the social worker she forgot to mention this incident during her interviews with the social worker in early September. Mother later told the social worker she ran into Father a week before the August 16 incident, and Father grabbed her by the wrist and tried to "get physical" with her, resulting in bruising.

6

Emma told the social worker that Father had been residing with Mother since the children were released to Mother in April 2019, and Mother and Father fought continuously. Before the August 16 altercation, Emma had not witnessed physical violence between the parents, but neighbors had approached Emma on multiple occasions stating they witnessed physical fights, including Mother and Father punching each other on the balcony. Mother asked Emma to lie about the situation when social workers visited the home. One of Emma's neighbors confirmed Mother and Father had been living at Emma's home for the last six months, and the neighbor had seen the parents arguing on several occasions. Father denied living at the home after the children were released to Mother in April, stating that although he and Mother argued on August 16, he left after a few minutes and they did not have a physical altercation. Eleven-year-old Henry similarly denied Father lived at the home or had argued with Mother. Henry said he had not seen Father since Justin's birthday in July.

On September 27, 2019 the Department filed a subsequent petition (§ 342) alleging under section 300, subdivisions (a) and (b)(1), that Mother and Father had a history of engaging in violent altercations, Father committed domestic violence on August 16, and Mother failed to protect the children from Father, allowing him to reside in the children's home and have unlimited access to them. The same day the Department filed a supplemental petition (§ 387) alleging Father was abusing marijuana and failed to comply with his case plan and Mother violated the juvenile court's visitation order by allowing Father to reside in the children's home with unlimited access to them, placing the children at substantial risk of serious physical harm.

On September 30 the court detained the children from Mother and ordered monitored visitation for Mother and Father for at least two hours twice per week, with Mother allowed "loosely" monitored visits at Wendy's home without Father present. After counsel for the Department noted that Mother and Father had not been ordered to complete a domestic violence program, the court requested the Department provide referrals to Mother and Father for domestic violence programs.

On October 15, 2019 Mother tested positive for methamphetamine. On November 6 the Department filed a first amended supplemental petition alleging Mother had a history of substance abuse and continued to abuse methamphetamine.

In November 2019 Mother again told the social worker Father never lived with her after the children were released to her, she did not have contact with Father, and the last time Father was present in the home was for Justin's July 2019 birthday party. Mother also denied she used methamphetamine, stating the positive test result in October was likely due to mislabeling by an intern at the testing facility. Mother stated, "'If I was using, I would not have tested.'" Mother admitted she relapsed by using marijuana. Mother was having consistent visits with the children for three hours every Sunday.

In January 2020 Wendy reported that up until December 30, 2019, Mother had quality visits with the children and would typically accompany Wendy on outings or visit the children in the home. However, Mother and Wendy had an argument after Wendy observed a "'hicky'" on Mother's neck and confronted Mother about being with Father. Wendy was not willing to continue to monitor Mother's visits because she believed Mother continued to see Father. In addition, during the

8

social worker's visit to the paternal grandparent's apartment complex where Father was living, the property manager provided video footage of Mother and Father engaged in a physical altercation in the parking garage on January 10 and reported that Mother and Father were together at the complex two days earlier.  On January 14 the social worker found Mother and Father packing up a homeless encampment across the street from a park near the paternal grandparents' apartment complex. Mother had a four-inch scratch on her cheek and neck but stated she received the injury fighting with another woman.  Mother claimed she was only at the park to help maternal grandmother clear a homeless encampment, and Mother had no idea Father would be there.  The social worker reminded Mother about the restraining order against Father.  Mother was currently homeless and living out her car, but she reported she had not used drugs and was willing to test on demand.  Mother tested negative for drugs on December 3, 2019 but failed to show up for three subsequent tests, most recently on January 8, 2020.

At the February 3, 2020 combined jurisdiction and disposition hearing and status review hearing, the juvenile court sustained the allegation in the subsequent petition under section 300, subdivision (b)(1), that Mother failed to protect the children from Father's domestic violence, including the August 16, 2019 incident at Emma's home and the earlier occasion when Father attempted to "get physical" with Mother.[5]  The court sustained the first amended supplemental petition based on Father's drug abuse and noncompliance with his case plan,

---

[5]     The juvenile court dismissed the allegation under section 300, subdivision (a).

Mother's allowing Father to have unmonitored access to the children, and Mother's continued methamphetamine use and positive drug test in October 2019. The court terminated reunification services, stating the case was more than 18 months old and the parents had been provided appropriate services. The court found the children were suitably placed with Wendy and ordered monitored visits at a Department-approved setting.

D.    *Post-reunification Period and Mother's Section 388 Petitions*

In May 2020 the Department reported the children were "adjusting and doing well" in Wendy's care. Wendy loved the children, was able to meet all of their needs, and wanted to adopt them if the parents were unable to reunify with them. The paternal grandparents monitored separate weekly visits for Mother and Father. The paternal grandparents reported that Mother's visits were "sometimes regular and then sporadic," and the visits generally lasted one to two hours once a week.

In November 2020 the Department reported that Mother told the social worker she was employed, renting a room, and participating in outpatient substance abuse services. According to Mother, she was no longer in a relationship with Father. The paternal grandparents continued to monitor separate weekly visits for Mother and Father, usually in a public park or garden because of the COVID-19 pandemic. The grandparents reported Mother had "quality visits" with Justin regularly, for at least one to two hours once a week, but the paternal grandparents did not provide any additional details about the visits or Mother's bond with Justin.

On February 6, 2021 Father was arrested for murder, robbery, and other charges, and he was in custody awaiting a

preliminary hearing set for July 7, 2021. The paternal grandparents told the social worker that Mother continued to visit the children weekly in the park, and Mother and the children had "close bonds." Wendy reported that Mother also visited the children in her home at least once during the week. Wendy reported "quality visits" with "no concerns." Mother engaged with the children and appropriately redirected them when needed. Wendy and her partner Mr. B. were committed to adopting both children, but they were amenable to a legal guardianship for Henry if he did not want to be adopted. Henry was reluctant about adoption and hoped to return to Mother. Justin, then four-years old, was too young to provide a "meaningful statement" about his desired placement, but he "appear[ed] connected to his caregivers."

On May 21, 2021 Mother filed a section 388 petition requesting the juvenile court take the selection and implementation hearing off calendar and release the children to her custody, or in the alternative, reinstate her reunification services. Mother stated she had completed a six-month substance abuse program with random drug testing, and she had provided 24 negative tests. Further, Mother participated in individual counseling and was visiting the children three to four times per week and attending their medical appointments whenever possible. Mother argued that granting her relief would be in the children's best interest because it would allow them "a chance to return to their biological mother and achieve permanency at home." Mother added, "[T]he children have a strong bond with their mother and when visited by her they are excited, and when she leaves they are unhappy." Mother submitted in support of her petition a letter dated May 21, 2021

11

from the director of Next Level Up Recovery LLC stating Mother had enrolled in its six-month outpatient drug program on November 9, 2020; she participated in meetings and submitted to random drug testing; she had 24 negative drug tests; and "she showed great improvement in her way of thinking when addressing her substance abuse issues."

At the May 24, 2021 hearing set for selection and implementation, Mother's attorney appeared by videoconference with Mother joining by telephone. At the beginning of the hearing the juvenile court denied the section 388 petition, finding there were no changed circumstances and the proposed modifications were not in the children's best interest. Mother's attorney did not request to present argument or evidence. The court continued the selection and implementation hearing until September 2021 because Henry was still considering whether he wanted to be adopted.

In August 2021 the Department modified Mother's visitation schedule because the paternal grandparents and Wendy had moved to locations further from Mother. Mother had monitored visits with the children for three to four hours on alternate Sundays, plus weekday visits monitored by Wendy or maternal aunt Irene P. Wendy and the paternal grandparents reported Mother visited the children on a consistent basis. Further, "The monitors and children report quality visits between [M]other and the children. The monitors report that [M]other is engaged with the children during visits and appropriately redirects the children during visits as needed." No further information was provided regarding the quality or content of the visits. Father remained in custody awaiting trial. Henry was now adamant he did not want to be adopted. The Department

recommended, and Wendy and Mr. B. agreed, to a permanent plan of legal guardianship for Henry and adoption for Justin.

On September 15, 2020 Mother filed a second section 388 petition as to Justin. The second petition repeated the arguments from the first petition and added that Mother's visits monitored by Wendy were "going very well." In addition, Mother had received a housing voucher and would be able to provide stable housing for the children. Mother submitted the May 21, 2021 letter from the director of Mother's outpatient recovery program she had submitted with her first petition, as well as a May 10, 2021 certificate of completion of the outpatient program and a United States Department of Housing and Urban Development housing voucher.

At the September 20, 2021 combined section 388 and selection and implementation hearing, the juvenile court denied Mother's second section 388 petition, finding "although Mother has complied with some of the case plan, these children have been out of her care and custody for a significant period of time. I find it's not in these children's best interest and I'm denying the 388 outright and going forward today . . . ." Mother's attorney appeared by videoconference, and Mother was on the telephone. Mother's attorney did not request to be heard on the section 388 petition.

As to the selection and implementation hearing, Mother's attorney argued the juvenile court should not terminate Mother's parental rights over Justin because the beneficial parental relationship exception applied. The attorney stated, "She's completed a six-month substance abuse program where she's tested randomly and provided clean tests. She's participated in individual counseling. She visits the children multiple times

13

throughout the week. Henry does not want to be adopted. And Mother has indicated to me that Justin if he was old enough he would also wish not to be adopted." The Department responded that Mother did not come "anywhere near meeting the requirements" for the beneficial parental relationship exception to apply. Minor's counsel joined in the Department's recommendation that Justin be adopted.

The juvenile court concluded without elaboration that "[t]here is no [section 366.26, subdivision (c)(1)(B)(i)] exception as to Justin."[6] The court found by clear and convincing evidence Justin was going to be adopted, and it terminated Mother's and Father's parental rights.[7]

---

[6] Although the juvenile court made no oral findings on the elements of the beneficial parental relationship exception, the minute order stated the court made a finding "the parent[] has not maintained regular visitation with the child and has not established a bond with the child [and] any benefit accruing to the child from his/her relationship with the parent(s) is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption, and that adoption is in the best interest of the child." This appears to be a boilerplate finding that does not reflect the court's findings on the record. We therefore do not consider these findings as part of our legal analysis. Inclusion of this type of boilerplate finding undermines the integrity of the proceedings and is a disservice to the parties and this court. We have criticized this practice and are deeply troubled that it persists. (See, e.g., *In re T.G.* (2020) 58 Cal.App.5th 275, 298, fn. 20.)

[7] The court continued the selection and implementation hearing with respect to Henry to obtain Wendy's signature on forms necessary to complete the legal guardianship.

Mother timely appealed from the juvenile court's May 24, 2021 order denying her first section 388 petition. She separately appealed from the September 20, 2021 denial of her second section 388 petition and the order terminating parental rights. On December 9, 2021 we consolidated Mother's appeals.

## DISCUSSION

A.  *The Juvenile Court Did Not Abuse Its Discretion in Denying Mother's Section 388 Petitions*

1.  *Applicable law and standard of review*

Section 388, subdivision (a)(1), provides, "Any parent or other person having an interest in a child who is a dependent of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." "Section 388 provides for modification of juvenile court orders when the moving party presents new evidence or a change of circumstances and demonstrates modification of the previous order is in the child's best interest." (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122; accord, *In re Jasmon O.* (1994) 8 Cal.4th 398, 414-415*; In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

"[Section 388] petitions are to be liberally construed in favor of granting a hearing to consider the parent's request. [Citations.] The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310; accord, *In re R.A.*

15

(2021) 61 Cal.App.5th 826, 836; see Cal. Rules of Court, rule 5.570(a) ["A petition for modification must be liberally construed in favor of its sufficiency."].)  "'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.'  [Citation.]  'Whether [the petitioner] made a prima facie showing entitling [the petitioner] to a hearing depends on the facts alleged in [the] petition, as well as the facts established as without dispute'" by the court's records.  (*In re B.C.* (2011) 192 Cal.App.4th 129, 141; see *In re Justice P.* (2004) 123 Cal.App.4th 181, 189 ["In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case."].)  "[T]he court may summarily deny the motion if the petition fails to make a prima facie showing (1) of a change of circumstances or new evidence requiring a changed order, and (2) the requested change would promote the best interests of the child."  (*In re Justice P.*, at pp. 188-189; accord, *In re R.A, supra*, 61 Cal.App.5th at p. 836.)  Further, "'[n]ot every change in circumstance can justify modification of a prior order'" under section 388.  (*In re N.F.* (2021) 68 Cal.App.5th 112, 1202.)  Rather, "''the change in circumstances must be substantial.'''"  (*In re Malick T., supra*, 73 Cal.App.5th at p. 1122; accord, *In re J.M.* (2020) 50 Cal.App.5th 833, 846.)

When a section 388 petition is filed after reunification services have been terminated, the focus is on the child's best interest.  (*Stephanie M., supra*, 7 Cal.4th at p. 317 ["After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of

16

the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child."]; *In re I.B.* (2020) 53 Cal.App.5th 133, 159.)

"We review the juvenile court's decision to grant or deny a section 388 petition for abuse of discretion." (*In re I.B., supra*, 53 Cal.App.5th at p. 152; accord, *Stephanie M., supra*, 7 Cal.4th at p. 318.) We likewise review a summary denial of a section 388 petition for abuse of discretion. (*In re R.A., supra*, 61 Cal.App.5th at p. 837; accord, *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

2.   *Mother failed to make a sufficient showing a modification was in Justin's best interest*

Mother contends the juvenile court abused its discretion in denying her section 388 petitions without holding a hearing despite Mother's successful completion of a six-month outpatient substance abuse program and counseling between November 2020 and May 2021, 24 negative drug tests during that period, positive visits with Justin, and in Mother's second petition, receipt of a housing voucher. The Department contends six months of sobriety at the time of Mother's first section 388 petition did not demonstrate changed circumstances because Mother relapsed after a previous period of treatment and sobriety. (See *In re N.F., supra*, 68 Cal.App.5th at p. 121 [juvenile court properly concluded Mother failed to establish sufficiently changed circumstances by evidence of completion of a 90-day residential program because Mother had twice completed programs and relapsed]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [father's seven months of sobriety since last relapse was

17

insufficient to show changed circumstances where it took him six months during prior dependency proceeding to achieve sobriety and he maintained sobriety for eight months before relapse].)

As Mother observes, however, there is no evidence she relapsed in the period following her completion of a drug treatment program in May 2021 leading up to the September 2021 hearing on her second section 388 petition. Although Mother did not present evidence she tested negative for drugs during this period, it appears from her petition and the Department's reports in the summer of 2021 that Mother gained stability in her life in that she was regularly visiting the children in Wendy's home during the week, and she had obtained a housing voucher that would enable her to live independently with the children. Mother therefore made a prima facie showing of changed circumstances, at least as to her second section 388 petition.

However, the juvenile court did not abuse its discretion in finding a change in Justin's placement or further delay on the eve of the selection and implementation hearing was not in Justin's best interest given his need for permanence and stability. (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.) At the time of the first section 388 petition, Justin was not yet five years old and had lived with Wendy for the prior three years of his life (other than the five-month period in 2019 when he was released to Mother). Justin was thriving in the care of Wendy and Mr. B., who provided him with a stable home and wanted to adopt him.

Although Mother made substantial progress with respect to drug rehabilitation and her visitation, her recovery was still nascent, and there was a danger she would relapse into abusing drugs while Justin was in her care, as she had in 2019.

Moreover, Mother's petitions did not address the sustained allegations of domestic violence and her failure to protect the children from Father. As discussed, Father was living with Mother and the children after release of the children to Mother in April 2019 in violation of the visitation order. Then, after the children were again detained following the August 16, 2019 domestic violence incident and the filing of the subsequent and supplemental petitions, in January 2020 Mother was captured on video in an altercation with Father at the paternal grandparents' apartment complex, and Mother was later found with Father at a nearby homeless encampment, in violation of the three-year criminal protective order barring Father from contact with Mother. Wendy refused to monitor Mother's visitation in early 2020 because she believed Mother and Father were still romantically involved. And Mother continued to lie to social workers, denying she was living with Father and suffered physical abuse, despite substantial evidence to the contrary. Mother presented no evidence she ended her relationship with Father after the court terminated her reunification services in February 2020, or that she in any way addressed her abusive relationship with Father and failure to protect the children.[8] Further, Mother failed to address Father's domestic violence in

---

[8] We recognize that at the time of the first section 388 petition in May 2021, Father was in custody awaiting a July 2021 preliminary hearing, after being arrested in February 2021 for murder and robbery, and Father was still in custody at the time of the September 2021 hearing. But the record does not reflect the outcome of Father's preliminary hearing or the possible release of Father pending trial.

19

her opening or reply brief on appeal, providing no response to the Department's argument Mother had not shown changed circumstances as to domestic violence. In light of the risk the pattern of domestic violence with Father would continue, especially given Mother's denial of abuse and violation of the criminal protective order, the trial court did not abuse its discretion in concluding a modification of the custody order was not in Justin's best interest.

B.    *The Juvenile Court Did Not Abuse Its Discretion in Finding the Beneficial Parental Relationship Exception to Adoption Did Not Apply*

1.    *Governing law and standard of review*

"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).'" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225 (*B.D.*); accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under section 366.26, subdivision (c)(1)(B)(i), "the parent may avoid termination of parental rights" if the parent establishes by a preponderance of the evidence "that the parent

20

has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra*, 11 Cal.5th at pp. 629-630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Caden C.*, at p. 633; *Katherine J.*, at p. 317.) "While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to

21

review for abuse of discretion." (*Caden C.*, at p. 630; accord, *B.D.,
supra*, 66 Cal.App.5th at p. 1225.)

    2.    *The juvenile court did not abuse its discretion*

Mother contends the juvenile court erred in terminating her parental rights over Justin because the court concluded "blithely and without identifying the evidence it was relying on" that the beneficial parental relationship exception did not apply. Mother argues the evidence compelled a finding in her favor on the first two steps of the analysis of the exception under *Caden C., supra* 11 Cal.4th at p. 629 in that she maintained regular visitation with Justin and Justin developed a strong bond with Mother such that he would benefit from continuing the relationship. Mother contends the court therefore abused its discretion in determining the benefit of adoption outweighed the benefit to Justin from his relationship with Mother.[9] The court did not abuse its discretion.

We agree with Mother that the juvenile court's failure to make findings on the record is troubling, and certainly the better practice would have been for the court to make findings as to each of the three steps of the *Caden C.* analysis for the benefit of the parents and potential appellate review. But such findings are not required. As the Court of Appeal explained in *In re A.L.* (2022) 73 Cal.App.5th 1131, at page 1156, "[W]e infer from

---

[9]    Mother's formulation of the third step of the *Caden C.* analysis is not quite accurate: the third step properly considers whether "losing the relationship with [Mother] would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.)

section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights would be detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination would not be detrimental." (Accord, *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109 [evidence in the record describing the nature of parents' visitation and the child's reaction supported an implied finding the parents failed to establish the beneficial parental relationship exception].) The California Rules of Court do not impose any additional requirement that the juvenile court make findings on the record when finding termination of parental rights would not be detrimental to the child. (See Cal. Rules of Court, rule 5.725(d).) Here, the court found in the selection and implementation hearing that "there is no [section 366.26, subdivision (c)(1)(B)(i)] exception as to Justin," from which we infer the court found Mother did not meet her burden to satisfy at least one of the steps of the *Caden C.* analysis.[10]

As to the first step of the *Caden C.* analysis, the record shows Mother carried her burden of proving by a preponderance of the evidence that she regularly visited Justin. Other than the period in early 2020 when Wendy withdrew as a monitor, from the beginning of the dependency case Mother visited the children

---

[10] The minute order of the hearing states Mother failed to meet her burden on all three steps of the *Caden C.* analysis. But, as discussed, the minute order does not reflect the juvenile court's more cursory oral findings on the record, so it is unclear whether the court found Mother had not met some or all of the steps.

at least once a week for one to three hours. In January 2020 Wendy reported Mother consistently visited the children for three hours every Sunday. In May 2020 the paternal grandparents reported Mother's visits were "regular and then sporadic," but generally visits lasted one to two hours each week. In November 2020, and again in May 2021, the grandparents reported regular, quality visits for at least one to two hours a week, despite the logistical challenges of the COVID-19 pandemic. In May 2021 Wendy reported Mother also visited the children in Wendy's home at least once during the weekdays. Thus, for at least the final year of the proceeding, Mother's visitation exceeded the allowable visitation in the custody order of two hours, twice per week. Under these circumstances, Mother maintained "regular visitation and contact with the child[ren]" (§ 366.26, subd. (c)(1)(B)(i)), "taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; cf. *In re J.C.* (2014) 226 Cal.App.4th 503, 531 [visitation not regular where the mother missed five visits in the six weeks preceding the selection hearing and there was a "troubling manner of [m]other's cancellations and pattern of changing her plans last minute"]; *In re C.F.* (2011) 193 Cal.App.4th 549, 554 [visitation not regular where "overall [the mother's] visitation was sporadic," including her visiting only three times in a three-month period despite an order allowing weekly visitation].)

With respect to the second step, Mother failed to establish Justin had a substantial, positive emotional attachment with her, as a result of which he would benefit from continuing the relationship. (*Caden C., supra*, 11 Cal.5th at p. 636.) At the selection and implementation hearing, Mother's attorney argued, "Mother has indicated to me that Justin if he was old enough he

24

would [like Henry] wish not to be adopted." But the record did not show that Justin, who had lived with Wendy from when he was 21 months old until he was five (except for a brief period when he was three years old), had a strong emotional attachment to Mother.[11] To be sure, Wendy and the monitors all reported Mother had "quality visits" with the children, Mother engaged with the children appropriately, and she redirected them when necessary. And in May 2021 the paternal grandparents reported generally that Mother and the children had "close bonds." But aside from Mother's own statement in her first section 388 petition that "the children have a strong bond with their mother and when visited by her they are excited, and when she leaves they are unhappy," Mother points to no evidence in the numerous Department reports, monitor interviews, and other records showing Justin was excited by Mother's visits or sad when he was separated from her. (See *Caden C., supra*, 11 Cal.5th at p. 632 ["courts often consider how children feel about, interact with, look to, or talk about their parents"].)

Finally, Mother failed to make any showing as to the third step that Justin's loss of his relationship with Mother would be detrimental to him "to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.) As discussed, Justin spent the majority of his life with Wendy, and there is no evidence Justin would suffer harm from losing his relationship with Mother. Conversely,

---

[11] The record reflects 12-year-old Henry, in contrast to his brother, was very closely bonded with Mother, enjoyed "designate[d] quality time" during visits with her, and consistently expressed a strong preference against adoption.

there was evidence Justin would benefit from placement in an adoptive home with Wendy.  Wendy and Mr. B. were able to meet Justin's needs emotionally, physically, and financially, and to provide a stable, clean, and safe home for him, and he was "thriving" in their care.  In short, Mother has not shown "'exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'"  (*Caden C., supra*, 11 Cal.5th at p. 631.)

## DISPOSITION

The juvenile court's orders denying Mother's section 388 petitions and terminating Mother's parental rights are affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.